BANCO POPULAR DE PUERTO RICO, ETC., Petitioner, *v.* DISTRICT COURT OF SAN JUAN, Respondent.

No. 1552. Argued December 8, 1943.—Decided February 9, 1944.

64

*Damián Monserrat, Jr., Gabriel de la Haba,* and *Rafael Baragaño, Jr.,* for petitioner. *M. Rodríguez Ramos, Acting Attorney General,* and *R. Rivera Zayas* for the members of the Investigating Committee of the House of Representatives.

MR. JUSTICE SNYDER delivered the opinion of the court.

Banco Territorial y Agrícola de Puerto Rico has been under liquidation in the District Court of San Juan pursuant to Act No. 17, Laws of P. R., 1933, for a number of years. The petitioner, Banco Popular de Puerto Rico, has served as the statutory liquidator from 1937 to date. On June 23, 1942 the petitioner filed a motion in the liquidation proceedings praying for the sale at public auction of the remaining assets of Banco Territorial. After proper notice and hearing, no opposition thereto having been filed, the said public sale was duly ordered, advertised, and held. Thereafter, on motion of the petitioner and after hearing thereon, the district court on January 7, 1943 entered an order approving, with minor exceptions, the sale of the remaining assets. No appeal was taken from this order.

On August 5, 1943 the petitioner filed a motion praying that the district court (a) approve its final report on the liquidation of Banco Territorial, and (b) discharge the petitioner from any further obligations in connection with the liquidation proceedings. Prior to action by the lower court on this motion, the members of a Special Investigating Committee of Banking Institutions in Liquidation of the House of Representatives, represented by the Attorney General, filed a motion in the district court dated, October 13, 1943, reciting that the said Committee, pursuant to a House Resolution, was investigating the sale involved herein and would render a report thereon to the House "and submit it to the consideration of this Honorable Court as a source of information and material for investigation, before this court reaches its final decision regarding the report and the accounts rendered by the liquidation". The motion quoted from the Resolution creating the investigating committee "the belief that certain abnormalities, irregularities, haste and ambiguity existed in the adjudication made at the sale of certain assets of the Banco Territorial y Agrícola de

Puerto Rico, nominally valued at approximately $420,000.00, which sale was made about October 30, 1942, for a sum which scarcely amounts to 2 per cent of said nominal value''. The motion concluded as follows:

"7. That the petitioners consider it essential for the best performance of the judicial function in this case, that this Honorable Court have at its disposition all reports and data which the Special Investigating Committee of the House may collect at the public hearings, to the end that the judicial order shall not be at variance with the result of the legislative investigation, to the prejudice and detriment of the public interests involved.

"WHEREFORE, the petitioners respectfully suggest and pray:

"(a) That this Honorable Court postpone the issuance of its order on the final report on the liquidation of the Banco Territorial y Agrícola de Puerto Rico until the Special Investigating Committee of the House files its report and a copy of the same is submitted to this Honorable Court, without prejudice to the liquidation being adjudged as finished, in order to avoid further unnecessary expense . . . "

The district court heard argument and took testimony on this motion. On November 12, 1943 the lower court entered an order reading in part as follows:

"WHEREAS, this court has no doubt that the report of the said Investigating Committee will be of great assistance in the decision to be reached on the final approval of the liquidation of the Banco Territorial y Agrícola, and that all of this will be to the benefit of the community as a whole due to the fact that the Bank under liquidation had a large number of depositors of limited means;

"WHEREAS, the report of the aforesaid Investigating Committee, as appears from the testimony adduced, will be finished and a copy of same filed with this court not later than four months from October 27;

"THEREFORE, the motion filed by Messrs. Piñero, Quiñones, Ellsworth, Nevares Santiago and Reguero González is granted, and consequently the decision of this court on the final report of the liquidation of the Banco Territorial y Agrícola de Puerto Rico is postponed until the aforesaid Special Investigating Committee of the House of Representatives of Puerto Rico files its report and submits a copy thereof to this court, without prejudice to adjudging the liquidation as finished."

We granted the petition of Banco Popular for certiorari to review this order on the merits in view of the contention that the order violated the constitutional doctrine of the separation of powers (Act No. 32, Laws of P. R., 1943).

The doctrine of the separation of powers, as originally set forth in the Federal and State constitutions and as applied to particular situations arising during the last one hundred and fifty years, has, on occasion, been imperfectly understood. It is simple for political theorists to assert glibly that the division of governmental powers consists of the following: the legislative department initiates policy, which the executive branch executes, with the judiciary adjudicating controversies resulting therefrom. But this is far from an answer to the manifold problems engendered by this doctrine of government. It serves only to define rather than to solve the really difficult problems.

At the risk of restating the obvious, it is well to recall the genesis of the doctrine of the separation of powers, "It was not without good reason, based on experience, that Americans, almost at the moment independence was declared, set up written frames of government or constitutions and put the separation of powers at the foundation and a bill of rights in the forefront of them. From the beginning down to the Revolution the colonies had been subject to a completely centralized government with no distribution of powers and had learned what this sort of government meant.... One cannot wonder that this doctrine was received in America and put in the bills of rights after independence when he reads the high-handed statutes, interfering with every sort of individual conduct and belief and teaching of which the colonial legislatures were continually guilty, or the statutes probating wills rejected by the courts, dictating the administration of particular estates, suspending the statute of limitations for a litigant in a particular case, and exempting a particular wrongdoer from liability for a particular

wrong for which his neighbors would be liable, with which colonial statute books are filled." (Pound, Administrative Law, pp. 51, 52, 54):

"The substructure of the new nation was a tripartite division of governmental powers, whose ultimate purpose was, in short, to secure the liberty of the individual from oppression by any one department." (Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 4). "The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." (Brandeis, J., dissenting in *Myers* v. *U. S.*, 272 U. S. 52, 293).

It cannot be gainsaid that the broad principle of separation of powers has been a vital factor in the preservation of our liberties since its adoption by the Founding Fathers. But at times difficulties have arisen because of the confusion of thought on two problems arising from the fact of separate but coequal departments of government.

In the first place, many have overlooked the point that absolute separation has never existed and was never intended to exist. Indeed, Madison wrote in The Federalist that some objected to the Constitution for the very reason that it did not provide for a real separation of powers. But as Madison observed, the phrase "separation of powers" is only partly true. It was never intended that each of the departments of government should operate in a vacuum, truly independent and aloof from the others. Rather what the Constitution guarded against was described as follows: "The accumulation of all powers, legislative, executive, and judiciary, in the *same* hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective,

may justly be pronounced the very definition of tyranny."
(The Federalist (edited by Lodge) p. 300—Italics ours). It
has, indeed, been suggested that the confusion engendered
by use of the phrase "separation of powers" might be dis-
sipated by describing the principle as the "separation of
ultimate functions". (Herwitz and Mulligan, The Legisla-
tive Investigating Committee, 33 Col. L. Rev. 1, 7). Be that
as it may, the courts are more concerned with the factual
and legal content of the principle rather than a choice among
competing shorthand descriptions. And it cannot be stated
too emphatically that the departments of government are as
much interconnected in their operations as they are inde-
pendent. In Madison's phrase, the powers of government
have been blended rather than separated. He maintained
that only a degree of separation was required, and that this
degree could be secured only by connecting and blending the
departments.[1] Beard, in The Republic at p. 190, describes
the resulting checks and balances as a kind of dynamic equi-
librium.

Examples illustrating this thesis readily come to mind.
The exercise of one "ultimate legislative function"—law-
making—is typically subject to veto by the executive. The
President may be impeached by the House of Representa-

[1] "If we look into the constitutions of the several States, we find that,
notwithstanding the emphatical and, in some instances, the unqualified terms in
which this axiom has been laid down, there is not a single instance in which
the several departments of power have been kept absolutely separate and dis-
tinct. New Hampshire, whose constitution was the last formed, seems to have
been fully aware of the impossibility and inexpediency of avoiding any mixture
whatever of these departments, and has qualified the doctrine by declaring
'that the legislative, executive, and judiciary powers ought to be kept as
separate from, and independent of, each other as the nature of a free govern-
ment will admit; or as is consistent with that chain of connection that binds
the whole fabric of the constitution in one indissoluble bond of unity and
amity.' "

" . . . unless these departments be so far connected and blended as to give
to each a constitutional control over the others, the degree of separation which
the maxim requires, as essential to a free government, can never in practice be
duly maintained." (The Federalist (edited by Lodge), pp. 303, 8).

tives and removed by the Senate. All the subordinate executives who serve under the President are the creatures of the Congress. Yet Congress has no executive power as such, in the sense that it may direct the action of executive officials on a day-by-day basis. Congress has the power of the purse and the sword; but the executive spends the money and wages the wars. The President conducts foreign relations. However, all treaties require ratification by the Senate. Judges are nominated by the President, confirmed by the Senate, and subject to impeachment by the House of Representatives. The President exercises the high judicial function involved in the pardoning power. And the courts, in passing on the constitutionality and meaning of statutes, share in the shaping of legislation. Complete recognition of the blending and interconnection of governmental powers has come with the creation of boards and commissions which (a) issue rules which are in effect legislation, (b) administer laws and thereby perform executive functions, and (c) decide particular cases, thus exercising judicial or quasi-judicial power.[2]

But it is not enough to understand the limited degree of separation involved in the separation of legislative, executive, and judicial power. A second problem remains—what is legislative, executive, or judicial power? Legislative power, for example, is neither a word of art nor a self-defining concept. An obvious illustration is the power of a house of the legislature, in aid of its law-making functions, under certain circumstances, to commit and to punish for contempt. (*Jurney* v. *MacCracken,* 294 U. S. 125; *McGrain*

---

[2] Holmes put it this way: "The great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other. . . . It does not seem to need argument to show that however we may disguise it by veiling words we do not and cannot carry out the distinction between legislative and executive action with mathematical precision and divide the branches into watertight compartments, . . ." (Holmes, J., dissenting in *Springer* v. *Philippine Islands,* 277 U. S. 189, 209, 211.)

v. *Daugherty,* 273 U. S. 135, 171–3). Such a power would seem at first blush to be without question one which is judicial in nature. But to label a power of the legislature as judicial is productive only of confusion. Characterization of such a power, after all, is only a statement of a result, and leaves inarticulate the reasoning required to reach that result. One must therefore discard the description, and test each situation by determining in a particular case (1) whether the particular function has been specifically assigned by the constitution to the branch of government attempting to exercise it, or (2) whether its exercise by that department is a necessary incident to other functions specifically granted to it. And in determining the latter question, the fact that one branch might use the methods, technique, and paraphernalia traditionally used by another branch is irrelevant. That is to say, the summoning of witnesses, the taking of testimony, and even the final adjudication of the controversy by the legislature in a contempt proceeding is by no means a derogation of the doctrine of the separation of powers. As has been pointed out, ''With both courts and legislatures the exercise of such a power is not the primary purpose of their creation, but subsidiary to the effectuation of that purpose. It secures to them the power to function as courts or legislatures. To designate such a power as 'judicial power' or as 'legislative power,' erroneously implies its exclusive exercise by one or the other organ of government, or, if it permits its exercise by both, implies in one instance an exception to the general character of power exercised by that department of government. It is accurate, however, to regard the power as subsidiary to the exercise of a greater and more comprehensive power for which the institution, whether court or, legislature, is created. Both institutions, whether in imitation of one another or for want of further inventiveness, have adopted the same device—summary commitment—to effectuate the main purposes of their existence.

Judicial sanction for the exercise of such a power by the legislature lies in the recognition of its necessity for the functioning of the legislative process." (Landis, *supra*, at p. 158).

We thus see that the use of the judicial technique is not fatal to the exercise by the legislature of a function incident to and in aid of legislating. The controlling factor is that the ultimate purpose is legislative. In the same way, this has been recognized in a related situation when the Legislature has vainly sought to charge the courts with non-judicial duties by establishing a facade of judicial technique to use in performing such non-judicial duties. Cardozo, with his usual felicity of expression, states the constitutional objections to such a course. In holding a statute invalid, he points out, in the case of *In Re Richardson*, 160 N. E. 655 (N. Y. 1928), speaking for the New York Court of Appeals, that under it a judge (pp. 657, 9) " . . . . is made the delegate of the Governor in aid of an executive act, the removal of a public officer. *Matter of Guden*, 171 N. Y. 529, 64 N. E. 451. At the word of command he is to give over the work of judging, and set himself to other work, the work of proving and advising. His findings when made will have none of the authority of a judgment. To borrow Beacon's phrase, they will not 'give the rule or sentence.' They will not be preliminary or ancillary to any rule or sentence to be pronounced by the judiciary in any of its branches. They will be mere advice to the Governor, who may adopt them, or modify them, or reject them altogether. From the beginnings of our history, the principle has been enforced that there is no inherent power in Executive or Legislature to charge the judiciary with administrative functions except when reasonably incidental to the fulfillment of judicial duties. *People* v. *Hall*, 169 N. Y. 184, 62 N. E. 170; *Matter of State Industrial Commission*, 224 N. Y. 13, 16, 119 N. E. 1027. The exigencies of

government have made it necessary to relax a merely doctrinaire adherence to a principle so flexible and practical, so largely a matter of sensible approximation, as that of the separation of powers. Elasticity has not meant that what is of the essence of the judicial function may be destroyed by turning the power to decide into a pallid opportunity to consult and recommend (cf. Frankfurter and Landis, Power of Congress, etc.; a Study in the Separation of Powers, 37 Harvard Law Review, 1010, 1020). . . . No doubt there are peripheral zones where the judicial and the administrative merge into each other. C. W. Pound, The Judicial Power, 35 Harv. L. R. 787, 789. Other instances can be cited. Greater N Y. Charter, §1534; *Mitchel* v. *Cropsey*, 177 App. Div. 663, 164 N.Y.S. 336. The hinterland may be plain when the frontier is uncertain."

Method, in brief, is not so important as the ultimate action to be taken by the department of government which is utilizing a particular method to gather the date on which it will base its action. And the vital difference between final action by the three branches of government, each acting within its sphere, has always been reasonably clear. An excellent statement to this effect is found in *Ex parte Battelle*, 277 Pac. 725 (Calif. 1929) at p. 731, as follows:

". . . We deem it timely, also, to state at this point in our inquiry that, by uniform custom, more or less rigidly adhered to, every official inquisition has from the earliest times made use of procedural methods which resemble those obtaining in judicial tribunals. This is because, in the nature of things, as exemplified by human experience, such methods have been found to furnish the surest means of arriving at the truth of the particular matter involved in the inquiry. It does not follow, however, that legislative bodies or administrative agencies or municipal organizations or executive officials by the mere employment of methods of procedure which resemble those employed or required in judicial tribunals must be held to be engaged in the exercise of a judicial function and to be thereby trenching upon the area exclusively assigned to the

judicial department of the state government. There has been some confusion in judicial decisions touching this subject which it is beyond the scope of our present inquiry to clear away, but it may not be inapt at this point to refer to the comment of Cooley in his great classic on constitutional limitations, wherein, after reviewing many authorities, he draws the conclusion: 'That that which distinguishes a judicial from a legislative act is that the one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of all future cases falling under its provisions.' In the opinion of Mr. Justice Holmes in the comparatively recent case of *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150, it is thus stated: 'A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.' That the method of each may resemble that of the other in the course of their respective inquests having these two different ends in view is not the important or determining factor, since the same underlying consideration operates to guide the procedural steps of both.'"[3]

Congress, in providing in the Organic Act for self-government for Puerto Rico in language as broad and as comprehensive as it could find (*Puerto Rico* v. *Shell Co.*, 302 U. S. 253), wisely followed the general pattern of separation of powers found in State and Federal constitutions (Title 48 U.S.C.A. §§771, 811, 861). We therefore approach the particular problem raised by the instant case with the same guidespots already noted; namely, (1) separation of powers does not belie joint action by the three coordinate and coequal branches of government, which are as interdepend-

[3] For further discussions of the dividing line between judicial and legislative or executive power, see *People ex rel. Leaf* v. *Orvis*, 30 N.E.(2) 28 (Ill. 1940); *Coleman* v. *Miller*, 307 U.S. 433 (1939); *Nashville, C. & St. L. Ry.* v. *Wallace*, 288 U.S. 249 (1933); Opinion of the Justices, 179 A. 344 (N.H. 1935); *Tutun* v. *United States*, 270 U.S. 568 (1926); Gellhorn, Cases on Administrative Law, pp. 34–159.

ent as they are independent, and (2) there is no encroachment on judicial power merely because the legislature, in the course of an investigation in aid of its law-making functions, uses the methods of the courts.

█ It serves to narrow the issue considerably to note at the outset that the petitioner conceded at the oral argument that the Resolution[4] authorizing the investigation involved herein is valid on its face. The petitioner has therefore in effect abandoned the contention made in its petition for certiorari that the investigation could have no practical end or purpose, on the ground that the legislature could not by legislation annul the sale under investigation.

We have no doubt that the petitioner has made an appropriate concession. From time immemorial the power of

---

[4] The minutes of the House of Representatives of the session held on April 15, 1943, read in part as follows:

"House Resolution No. 13—Mr. Piñero presents House Resolution No. 13, whose title and text read literally as follows:

" 'To order an investigation of the status of the liquidation of the Banco Territorial y Agrícola de Puerto Rico and the Banco Comercial de Puerto Rico, and especially of the proceedings concerning the sale at public auction of the assets of the Banco Territorial y Agrícola de Puerto Rico; to create a Committee of this House, to conduct said investigation, and to render a report to the House; to authorize the appointment of the necessary personnel, and for other purposes.

" 'WHEREAS, everything relating to the liquidation of the Banco Territorial y Agrícola de Puerto Rico and the Banco Comercial de Puerto Rico is a matter of public interest because large sums of money representing the only property of numerous persons of the middle and poor classes of Puerto Rico were deposited with said banks;

" 'WHEREAS, the closing of these banks created a serious economic crisis and in many instances the ruin of a large number of the inhabitants of Puerto Rico;

" 'WHEREAS, the belief exists that certain irregularities, haste, and ambiguity existed in the adjudication made in the sale of certain assets of the Banco Territorial y Agrícola de Puerto Rico, nominally valued at approximately $420,000.00, which sale was effected about October 30, 1942, for a sum which scarcely amounts to 2% of said nominal value,

" 'THEREFORE, be it resolved by the House of Representatives of Puerto Rico:

" 'First: That a Committee composed of five representatives be appointed to investigate the proceedings relating to the sale at public auction of the

the legislative branch of government to conduct investigations in aid of its legislative functions has never been successfully challenged. "To deny [the Legislature] power to acquaint itself with facts is equivalent to requiring it to prescribe remedies in darkness." (Landis, Constitutional Limitations on the Congressional Power of Investigation, *supra*, at p. 209). And it is trite to say that the regulation and supervision of the operations of banks are a valid subject of legislation. Our legislature has in the past given ample evidence of its concern for suitable legislation in this field. (Act No. 18, Laws of P. R., Special Session, 1923; Acts Nos. 2, 17, 55, Laws of P. R., 1933; Act No. 180, Laws of P. R., 1942). And, as we have seen, the fact that, in the course of an investigation to obtain information on which to base

assets of said Banco Territorial y Agrícola de Puerto Rico and Banco Comercial do Puerto Rico, and especially to the sale at public auction of certain property valued at approximately $420,000, which was made about October 30, 1942, for a sum which scarcely amounts to 2% of said nominal value.

" 'Second: In order to fulfill the aims and purposes of the investigation ordered through this Resolution, the said Committee of Representatives shall have the power to hold public hearings, even after the current annual regular session of the Legislature shall have ended: to summon witnesses and compel them to appear, to take oaths, and to utilize the employees of the House of Representatives as the personnel necessary to carry out said investigation. Said Committee is also authorized to utilize the services of an attorney who will serve as legal advisor in the study and analysis of the proceedings through which the aforesaid assets were sold at public auction.

" 'Third: Said Committee shall render to this House of Representatives a detailed report of the result of its investigation at the beginning of the next regular session of the Legislature of Puerto Rico, and, if possible, at any special session which might be held after the present session adjourns.'

"After being duly seconded by Mr. Negrón López, said Resolution was put to a vote and was unanimously approved.

"On motion of Mr. Negrón López the Banco Industrial de Puerto Rico is included among the banks to be investigated by the Committee whose appointment is provided for in the first paragraph of the directive portion of the Resolution which has just been approved.

"On motion of Mr. Valiente it is unanimously decided to include in the investigation to be made, all banks that are at the present time in liquidation.

"The Speaker appoints Messrs. Piñero, Quiñones, Ellsworth, Nevárez Santiago and Reguero González to constitute the Special Investigating Committee of the banking institutions in the process of liquidation."

legislation, the legislature uses technique more commonly utilized in the courts is not objectionable.

Nor is it fatal to the validity of Resolution No. 13 that it fails to recite that the investigation in question is being conducted in aid of legislative functions. The only test such a resolution is required to meet is that it could have a legitimate object. If this be so, the courts are bound to presume that such was the purpose of the legislative action. This has been settled by *McGrain* v. *Dougherty, supra,* which used the following language in a similar situation (pp. 177, 178): "It is quite true that the resolution directing the investigations does not in terms avow that it is intended to be in aid of legislation; but it does show that the subject to be investigated . . . was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit. . . . The only legitimate object the Senate could have in ordering the investigation was to aid it in legislating; and we think the subject-matter was such that the presumption should be indulged that this was the real object. An express avowal of the object would have been better; but in view of the particular subject-matter was not indispensable."

The petitioner, however, apparently does argue that the Resolution has in effect been invalidated by alleged defects and improprieties in the motion of October 13, 1943, and the order of November 12, 1943, granting the same. We are unable to agree with that position. "Not what has been done under a statute, but what may reasonably be done under it, is the test of its validity." (*In Re Richardson, supra,* at p. 661). We must therefore turn to the petition, and the order granting it, to determine, not if the Resolution and the investigation being conducted pursuant thereto are illegal, but if the order of the lower court was improper.

Here again, the parties do not differ substantially in their statement of the relevant rule of law. While taking

78

the position that the investigation is valid, subject to the qualification that the legislature cannot by mere legislative fiat reverse or annul the judicial order approving the sale in question, the petitioner does concede that the investigation being valid, there is nothing to prevent the lower court, when passing on matters before it, from having access to facts which the House of Representatives might develop incidental to its investigation. "It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits." (*Sinclair* v. *United States,* 279 U. S. 263, 295). Certainly those under investigation cannot be heard to say, for example, that it is the exclusive prerogative and duty of the executive branch of the government to ferret out fraud. Indeed, for the legislature to fold its arms on any such theory and for the courts to reject such a proffer would constitute dereliction of duty on the part of both grounded on a non-existent application of the doctrine of separation of powers.

 The matter before us therefore finally resolves itself into determining the manner in which the district court may use the report which the Committee plans to submit to it. The petitioner is correct in its contention that the district court is not bound to accept out-of-hand the facts and conclusions of the legislative Committee. No one has raised the question, and we have therefore assumed that in conducting the liquidation of an insolvent bank under Act No. 17, Laws of P. R., 1933, a district court exercises "judicial power". Consequently, to permit the legislature or a Committee of one of its houses to dictate to a court the result it must reach in deciding particular questions before it at any stage of the matter herein would be to permit the leg-

islature to usurp a function which has been vested in the courts. We do not find ourselves here in one of the "peripheral zones" which troubled Cardozo in *In Re Richardson, supra*, "where the judicial and the administrative merge into each other". This case is within the "plain hinterland" of judicial power, far from the "uncertain frontier" where other branches of government are encountered. We add, in fairness to the Committee and its counsel, that they have not taken a contrary position in this court. They readily concede that the primary purpose of Resolution No. 13 is in aid of Legislative functions, and that any facts developed by the Committee will be presented to the district court only, to quote the language of their brief, "as a source of information for the investigation which the court will make as a part of the judicial function".

Likewise, the parties are not far apart on the admissibility in evidence of such a report. The petitioner seems concerned that under the order of November 12, 1943, of the district court the report would (*a*) be admitted in evidence, and (*b*) it would have no opportunity to rebut or explain it. The report as such would not be admissible in evidence, since it necessarily would not have been developed under all the traditional safeguards of strict judicial procedure (*Thad Benson Carter* v. *Kubler*, ___U. S.___, 12 U. S. L. W. 4004,5, decided by the Supreme Court of the U. S. on Nov. 8, 1943; *Mayagüez Sugar Co.* v. *Court of Tax Appeals*, 60 P.R.R. 737, 741-2). But once more the Attorney General, as counsel for the Committee, readily concedes the point in question. His brief states: "We must presume that the lower court, upon receipt of the report, will use it as a source of information to broaden the investigation, if it deems it necessary, and for nothing else." For reasons that need not concern us here, at times information not available to the executive branch of government is sometimes more effectively developed by legislative investigation (Cf. *Sinclair* v.

*United States, supra*). Indeed, such circumstances present a dramatic illustration of the already-noted interplay and interdependence of the different branches of government which is demanded in the interest of the people as a whole. But once such a report is furnished to the courts and to the executive, each will know how to fulfill its respective rules.

The order of November 12, 1943, on final analysis, is comparatively innocuous. It provides that consideration of the motion of the petitioner of August 5, 1943, for acceptance of its final accounts and its discharge would be postponed for four months, in view of the testimony that by that date—February 27, 1944—the report of the legislative Committee would be filed with the district court. We can see no undue prejudice to the statutory liquidator in delaying for four months, in order to receive the report, this last formal step in a liquidation proceeding which has been conducted for eleven years.

We make it clear that the postponement involved herein was in the discretion of the district court. The Committee had no right to demand such action. But the court, if it felt it advisable, was entitled, as a part of the judicial process, to take this step when requested to do so by the legislative Committee. And in the absence of abuse of such discretion—which is wholly lacking here—this court will not interfere with such action by the lower court.

Perhaps the controversy now before us would not have arisen if the lower court had stated explicitly how it would handle the report upon its receipt. However, the order is silent on what use will be made thereof. But the fact remains that the parties are in virtual agreement that the lower court will not be bound in any way by the findings and conclusions of the report. The difficulties raised by this case can perhaps be traced to the phraseology of the motion of October 13, 1943, of the Committee. This was undeniably couched in unfortunate language, in that it indicated that

the report would be furnished to the court "to the end that the judicial order shall not be at variance with the result of the legislative investigation". But the fact remains that both the prayer of this motion and the order entered thereon contain no such language. It is simply requested—and the court simply directed—that the report be filed with the court. There can therefore be no justifiable complaint about the dispositive portion of the order. There is nothing therein which commits the court to do anything other than what we have already indicated it may do—receive the report, and through its own processes, develop at a *de novo* proceeding the facts, with all the safeguards traditional in a lawsuit. Once the facts are developed before the district court in this fashion, it will discard the report which will never be technically admitted in evidence and will weigh the evidence actually admitted and render its own independent judgment on the facts and on the law, without reference to the views of the legislative committee.[5] As the Attorney General is not in disagreement with this position, the controversy boils down to a fear on the part of the petitioner that the district court will not understand and respect the necessary limitations of its own order. That would be a gratuitous assumption which we are unwilling to make. Rather the lower court is entitled to the presumption that it will use the report, if at all, only in the manner herein outlined.

The resolution of the House reveals that it was concerned about the sale of the remaining assets of Banco Territorial. Whether that order was improvidently entered was a matter to be determined by appeal, which the Treasurer and other interested parties did not take. Under what circumstances, and in what type of proceeding, if any, the said order could hereafter be assailed is a matter not before us and on which we therefore express no view.

---

[5] The frailty of the contrary argument is even more convincingly demonstrated when we recall that the House of Representatives or the legislature as a whole is at liberty to reject the report of the Committee.

Two procedural questions remain for disposition. The Attorney General contends that the petitioner, as statutory liquidator of an insolvent bank, has no standing to raise the question involved herein. He relies on *Treasurer of P. R. v. Banco Comercial*, 44 P.R.R. 767. That case is easily distinguishable. There we held that in a similar proceeding the receiver had no right of appeal where the order of the district court involved only a question of preference among creditors. But here the interests of the liquidator itself are directly involved, inasmuch as the question is whether its final accounts shall be approved and whether it shall be relieved from further activity and responsibility. Its right to terminate its trusteeship is at stake. Under such circumstances it is impossible to agree with this contention of the Attorney General that the petitioner has no interest in the order of November 12, 1943.

In the same way, the petitioner argues that the Attorney General cannot validly represent the legislative Committee. Resolution No. 13 specifically authorizes the appointment of counsel. It might have been more appropriate for the Committee to employ its own counsel, particularly as such investigations are sometimes directed against executive action (*Cf. Sinclair v. United States, supra; United States v. Smith*, 286 U.S. 6). But that is a matter which rests in the unfettered discretion of the legislative branch. There is nothing which prevents the legislature from utilizing in such a situation the services of counsel ordinarily engaged in work for the executive department. Indeed, where the legislature, deeming that no inquiry is being made into the conduct of executive officials sufficient to justify exclusion of executive legal officials therefrom, chooses to operate in this manner, we are furnished with still another example of joint governmental action which lays bare the fabric of government as a seamless web.

The writ of certiorari will be discharged.