Anthony LOPIPARO, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15089.

United States Court of Appeals
Eighth Circuit.

Oct. 29, 1954.

Collet, Circuit Judge, dissented.

Sidney M. Glazer, St. Louis, Mo. (Godfrey P. Padberg, St. Louis, Mo., was with him on the brief), for appellant.

Max H. Goldschein, Sp. Asst. to the Atty. Gen. (William K. Stanard II, Asst. U. S. Atty., St. Louis, Mo., was on the brief), for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment and order of the District Court committing the appellant, Anthony Lopiparo, for contempt for refusing to comply with an order of the court requiring him, as President of the Twin City Distributing Company, a corporation, of St. Louis, Missouri, to produce before the Grand Jury certain books of that Company.

On May 19, 1954, the appellant, with his counsel, was before the court in the presence of the Grand Jury. Counsel for the Government advised the court that the appellant, a witness who appeared before the Grand Jury under subpoena, had, on the day before, been asked, as President of the Twin City Distributing Company, to bring before the Grand Jury the books of the Company; that the appellant claimed his privilege against self-incrimination; that he was then directed to bring the books and have his counsel with him before the Grand Jury on the morning of May 19, 1954; that he was before the Grand Jury on that morning, and upon being asked whether he had brought the books for the year 1953 with him, claimed his privilege and refused to answer any questions about the Company's books. The hearing before the court was, on request of appellant's counsel, continued until 2:00 P.M. At that time appellant's counsel asked for more time to show his client's background and that he was reputed to be "a hoodlum, a gangster of renowned reputation," with a long criminal record.

Counsel for the Government stated that, if true, those facts would present no legal reason for not producing the Company's records; that all the Grand Jury was asking for was these records; and that appellant "can either bring the books before the Grand Jury or show the Grand Jury that he does not have the books and can't comply." Upon being questioned by the court, the appellant stated that he had not produced the books, as requested by the Grand Jury, because he did not know who had them. The court directed him to have the books before the Grand Jury at 10:00 o'clock on May 20, without fail.

The appellant, with his counsel, was again brought before the court at 10:00 o'clock on the morning of May 20. Appellant's counsel stated what his client had told him about having attempted to locate the books without success. The court directed the appellant to take the witness stand. At the conclusion of the appellant's testimony relative to his efforts to locate the books and as to other matters, the court, on its own motion and without objection from counsel, ordered all of the testimony stricken on the ground that the court's action in directing the appellant to take the stand might be regarded as coercive and prejudicial to his rights.

Counsel for appellant then stated to the court that he had only one witness present, that he had not been able to subpoena others, and that he would like additional time. Counsel for the Government stated that the Grand Jury was waiting and that he would like to continue "as far as we can go."

The Government produced evidence to the effect that the appellant was President of the Twin City Distributing Company and owned 48.7% of its common

stock; that Anthony Giondono was Vice-President and owned 29.2% of its stock; and that Ralph Caleca was Secretary-Treasurer and held 22.1% of the stock. Counsel for the appellant asked for additional time to show that it was physically impossible for the appellant to produce the books. Counsel for the Government stated that the appellant had had three days to bring in the books, and that his failure to comply with the court's order was a deliberate defiance of that order. Government counsel urged that the appellant be committed for contempt.

The appellant then produced as a witness Andrew Devoti, who testified that he was a public accountant and that in 1953 his wife worked three days a week for the Twin City Distributing Company; that appellant came to his home the night of May 19, 1954, and asked both him and his wife if they knew where the books of the Company were, and that they told him they did not know; that he (Devoti) did not know where the books were; that when they (the Devotis) were through with the books they brought them back to the Company's office; that he personally left them there; and that the last time he brought them back was, he believed, about the first week in September, 1953, in the nighttime.

The court then stated that it would give the appellant one further chance to comply with the order of the court, and allowed him until 2:00 o'clock that afternoon (May 20, 1954) to produce the journal and general ledger of the Company of which he was the President, and ordered him to have them at that time. Appellant's counsel then said, "In the Grand Jury room or down here, Your Honor?" The court replied: "In the Grand Jury room, and if he does not he will be down here very soon. We will take care of him."

At 3:50 P.M. on May 20 the court was advised that the appellant had again appeared before the Grand Jury, but had not produced the books as ordered by the court. At the request of Government counsel, further hearing was postponed until May 21 at 10:00 o'clock. At that time and in the presence of the Grand Jury, counsel for the Government read to the court the questions asked of the appellant before the Grand Jury on the afternoon of May 20 and his answers. The appellant had testified that he had "tried every which way to find them books"; that he could not locate them; that he had asked his auditor and the girl who worked in the office if they knew where the books were, and had talked to Mr. Giondono, the Vice-President, and Mr. Caleca, the Secretary-Treasurer, of the Company; that none of them knew where the books were; that the Sheriff who had padlocked the office might have taken the files. He also testified that it could have been nine to ten months since he saw the books; that it might have been in September, 1953; that he believed "that is when they arrested us, put a padlock on"; that on the last occasion he was in the office he did not look to see if the books were there. When asked who was in charge of the office when he left and when he was absent, he claimed his privilege against self-incrimination. He testified that the Sheriff had taken possession of the office under an attachment because it was said the Twin City Distributing Company was "charged with having counterfeit cigarette stamps."

We quote the following questions and the appellant's replies before the Grand Jury on the direct examination by counsel for the Government:

"Have you been in the Twin City Distributing Company office since that time [the time when the Sheriff of the City of St. Louis attached the office]?

"I stand on my constitutional right on the ground it may tend to incriminate me.

"It will incriminate you to tell the Grand Jury whether or not you were in the offices of the Twin City Distributing Company after the sheriff attached the place?

"I stand on my constitutional right on the grounds it may tend to incriminate me.

"Were the books in the office of the Twin City Distributing Company after the sheriff attached the place?

"I stand on my constitutional rights on the ground it may tend to incriminate me.

"Where were the books taken out of the Twin City Distributing Company or were the books taken out of the Twin City Distributing Company after the sheriff attached the place, Mr. Lopiparo?

"I stand on my constitutional rights on the ground it may tend to incriminate me.

\* \* \* \* \* \*

"Were the books taken out after?

"I stand on my constitutional rights on the ground it may tend to incriminate me.

"Mr. Lopiparo, how long did the sheriff have an attachment on Twin City Distributing Company, approximately, can you tell us?

"No, I don't know.

"About how long?

"I don't know.

"Did you sell any of the equipment of the Twin City Distributing Company?

"I stand on my constitutional rights on the ground it may tend to incriminate me.

"Did you take the books out of the Twin City Distributing Company?

"I stand on my constitutional rights on the grounds it might tend to incriminate me."

Following the reading of the questions asked the appellant and the answers given by him before the Grand Jury, counsel for the appellant stated that he had some witnesses present. The court asked if the witnesses would tell where the books were. Counsel stated that he did not know; that he had present the Clerk of the Circuit Court of the City of St. Louis, who would testify that an attachment was issued and delivered to the Sheriff of the City of St. Louis, who was also present in the courtroom; and that he (counsel) would like to have the Sheriff take the stand to show that, under the writ of attachment, he went out to Twin City Distributing Company and took everything in possession and stored it. The court asked whether the Sheriff would testify that he had the books. Counsel stated that he had never asked him. The court told counsel to find out what the Sheriff would testify, and to make an offer of proof. After consulting with the Sheriff, counsel stated that the Sheriff had given him a list of the articles taken under the writ of attachment. The court stated that it was not interested in what articles were taken under the writ of attachment, but wanted to know where the books were.

Counsel for the appellant then made an offer to prove by police officers and a deputy sheriff that on September 11, 1953, the appellant and others connected with the Twin City Distributing Company were arrested and taken to the police department, and that, at the time of their release shortly thereafter, they were not permitted to enter the office of the Company, which was then in the possession of the Sheriff. Counsel also offered to prove that the appellant was reputed to be a gangster and a notorious underworld character and had been interrogated by the "Kefauver Committee" investigating organized crime in interstate commerce.

When asked by the court as to what materiality the appellant's background had with respect to production of the corporate books, counsel stated that what he was trying to show was "that with his background and his general reputation that he can't take the stand and show in good faith he attempted to get the records, and he does not have the physical ability to comply with the Court's order because if he did that he would be waiving his privilege under the Fifth Amendment of the Constitution of the United States, that is what that offer of proof

would be for, Your Honor; \* \* \*." The court rejected the offer of proof.

In conclusion, counsel for appellant said:

" \* \* \* I would just like to clear up one thing. I am in total agreement with Mr. Goldschein [counsel for the Government] that these records, the Grand Jury has the right to have them available before them. I would like to state I am bringing out his [appellant's] record to show he can't take the stand because he would be waiving the Fifth Amendment, that the Grand Jury are entitled to have them as such but I can't show good faith on his part to comply with the order."

The court found that the appellant had willfully and deliberately disobeyed the order of the court by refusing, as President of the Twin City Distributing Company, to bring before the Grand Jury the journal and general ledger of the Company, and was guilty of contempt. The court ordered the appellant committed to the custody of the United States Marshal "for imprisonment for a period of eighteen months, or until the further order of this Court should he produce before the Grand Jury the aforesaid records before the expiration of said sentence, or the discharge of said Grand Jury."

The appellant concedes that a corporate officer may be compelled to produce corporate records, although they incriminate him. Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771. He also concedes that the record shows that the appellant is the President of the Twin City Distributing Company and the owner of some 48% of its common stock.

The appellant contends, however: (1) that the evidence was insufficient to sustain the court's judgment and order; (2) that the appellant was not given proper notice of the charge and a reasonable time for the preparation of his defense; and (3) that the court erred in

excluding evidence relative to (a) the attachment by the Sheriff and appellant's arrest, (b) the reputation of appellant, and (c) the investigation of appellant by the Grand Jury.

█ The fact that the appellant was the President of the Twin City Distributing Company justified the court in concluding that he had control of the books of the Company or could obtain them or could furnish some reasonable and convincing explanation of their whereabouts or of his inability to produce them if they were in fact not available to him. See Wilson v. United States, supra, at page 385 of 221 U.S., at page 546 of 31 S.Ct.

██ The District Court did not believe and was not compelled to believe the testimony of the appellant that he was unable to find the books he was ordered to produce. The court was the judge of the appellant's credibility and the weight of his evidence. The appellant's self-interest was obvious. His defense was one easily fabricated and almost impossible to disprove. Although the other corporate officers of the Company were, according to his own testimony, accessible to him, he failed to produce them to substantiate his claim as to the unavailability of the books. We think that the evidence was sufficient to sustain the contempt order.

In United States v. Bryan, 339 U.S. 323, 330–332, 70 S.Ct. 724, 730, 94 L.Ed. 884, the Supreme Court said:

"Ordinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply. A court will not imprison a witness for failure to produce documents which he does not have unless he is responsible for their unavailability, cf. Jurney v. MacCracken, supra [294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802], or is impeding justice by not explaining what happened to them, United States v. Goldstein, 2 Cir., 1939, 105 F.2d 150.

"On the other hand, persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned. See, e. g., Blair v. United States, 1919, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979; Blackmer v. United States, 1932, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375.

\* \* \* \* \* \*

" \* \* \* Testimonial compulsion is an intensely practical matter. If, therefore, a witness seeks to excuse a default on grounds of inability to comply with the subpoena, we think the defense must fail in the absence of even a modicum of good faith in responding to the subpoena."

The appellant in the instant case did not *prove* that he was unable to comply with the court's order, and his defense for noncompliance, we think, lacked a "modicum of good faith."

■ There was, in our opinion, no error committed by the court in rejecting the appellant's offers of proof. That the appellant was peculiarly vulnerable to self-incrimination, had no legal materiality, we think, so far as the question of his failure to produce the books of his Company was concerned, nor had the fact that he had been arrested and the office of his Company attached in September of 1953. Whether the Grand Jury was investigating him or his Company was a matter of no consequence with respect to his failure to comply with the order of the court.

■ The procedure followed by the District Court was not inappropriate. The situation called for prompt action on the part of the court in aid of its Grand Jury. The appellant was advised from the beginning that he must produce the books or prove by convincing evidence his inability to produce them, and that if he failed or refused he would be subject to commitment for contempt. The proceedings leading to his commitment were had in the presence of the court and the Grand Jury. There was no showing that if given additional time the appellant could or would procure and produce the books or prove that he was unable to produce them. His counsel virtually conceded that the appellant could not show a good faith effort to comply with the court's order to produce. That a corporate officer who unjustifiably refuses to produce corporate books and records which he has been ordered to produce may be committed for contempt is not subject to question. Wilson v. United States, supra, at page 376 of 221 U.S., at page 542 of 31 S.Ct.

■ The punishment imposed upon the appellant was not, we think, excessive.

The judgment and order appealed from is affirmed.

COLLET, Circuit Judge (dissenting).

Defendant was the illiterate president of some kind of a corporation. He could neither read nor write. He had never been in charge of the books of the corporation, had never kept the books nor had any control over them other than constructive, as the president of the corporation. In laymen's language, he was being hotly pursued by the "Law", federal, state, and congressional. Some kind of a charge had been lodged against the corporation by the state authorities for using counterfeit cigarette tax stamps. In September, 1953, he and others connected with the corporate business were arrested by the city police and taken to the police station. They were

held there for a short time and returned to the place of arrest. When they arrived there they found that, by coincidence or otherwise, during their absence the sheriff's office had padlocked the corporate place of business and taken possession of all of its contents.

The following May, defendant was summoned before the federal grand jury and asked to produce the corporate books and records. He stood on his constitutional rights. Upon being advised that his personal constitutional rights did not extend to the production of corporate books and records, he testified that he did not have them, did not know where they were, had never kept them, and they had never been under his control, but that he would try to find them. He testified that he tried to find them. He produced a witness who testified that the last time they were seen to the witness' knowledge was shortly before the raid by the sheriff's office in September, 1953, when they were placed in the office of the corporation. Defendant steadfastly insisted that he did not have them, that he was afraid to offer himself as a witness for fear of waiving his constitutional rights. He had some justification for that fear. That is exactly what government counsel contended before the court, after the court had called him as a witness. The court very properly struck the evidence that was produced in response to the court's direction that he take the witness stand, in order to eliminate any possible element of coercion. But that left him in the situation where if he voluntarily offered himself as a witness, government counsel would have been able to contend that he was subject to broad cross-examination.

Defendant was charged, not with perjury, not with failure to answer proper questions propounded to him by the grand jury, but with failing to produce the books of the corporation. The court denominated the proceedings as criminal contempt proceedings. Counsel for the government so characterizes the proceedings. He was convicted without one scintilla of direct evidence that he actually had the books and records of the corporation. The presumption, inference, or implication arising from proof that a corporate president who actually had charge of the corporate books could be presumed to still have them, see Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, was applied to defendant here without any proof that he had ever had control of the books. That inference, aided by inferences drawn from the defendant standing upon his constitutional right and declining upon those grounds to answer questions, is said to be adequate proof to sustain his conviction. Be he "hoodlum" or not, I do not agree.