## JURNEY *v.* MacCRACKEN.

No. 339. Argued January 7, 8, 1935.—Decided February 4, 1935.

*Mr. Leslie C. Garnett,* United States Attorney for the District of Columbia, with whom *Mr. H. L. Underwood,* Assistant United States Attorney, was on the brief, for petitioner.

128

By leave of Court, *Hon. Hatton W. Sumners,* Chairman of the House Committee on the Judiciary, argued the cause on behalf of the House of Representatives, as *amicus curiae.**

---

*The substance of Mr. Sumners' oral argument is taken from a copy which was kindly furnished by him at the request of the Reporter.

130

134

*Mr. Frank J. Hogan,* with whom *Messrs. Edmund L. Jones,* and *Duke M. Patrick* were on the brief, for respondent.

136

138

140

142

Mr. Justice Brandeis delivered the opinion of the Court.

This petition for a writ of *habeas corpus* was brought in the Supreme Court of the District of Columbia by William P. MacCracken, Jr., against Chesley W. Jurney, the Sergeant-at-Arms of the Senate of the United States. The writ issued; the body of the petitioner was produced before that court; and the case was then heard on demurrer to the petition. The trial court discharged the writ and dismissed the petition. The Court of Appeals, two justices dissenting, reversed that judgment and remanded the case to the Supreme Court of the District with directions to discharge the prisoner from custody. 63 App. D. C. 342; 72 F. (2d) 560. This Court granted certiorari because of the importance of the question presented.

The petition alleges that MacCracken was, on February 12, 1934, arrested, and is held, under a warrant issued on February 9, 1934, after MacCracken had respectfully declined to appear before the bar of the Senate in response to a citation served upon him pursuant to Resolution 172, adopted by the Senate on February 5, 1934. The Resolution provides:

" Resolved, That the President of the Senate issue a citation directing William P. MacCracken, Jr., L. H. Brittin, Gilbert Givvin, and Harris M. Hanshue to show cause why they should not be punished for contempt of the Senate, on account of the destruction and removal of certain papers, files, and memorandums from the files of William P. MacCracken, Jr., after a subpoena had been served upon William P. MacCracken, Jr., as shown by the report of the Special Senate Committee Investigating Ocean and Air Mail Contracts."

It is conceded that the Senate was engaged in an enquiry which it had the constitutional power to make; that the Committee[1] had authority to require the production of papers as a necessary incident of the power of legislation; and that the Senate had the power to coerce their production by means of arrest. *McGrain* v. *Daugherty*, 273 U. S. 135. No question is raised as to the propriety of the scope of the subpoena *duces tecum*, or as to the regularity of any of the proceedings which preceded the arrest. The claim of privilege hereinafter referred to is no longer an issue. MacCracken's sole contention is that the Senate was without power to arrest him with a view to punishing him, because the act complained of—the alleged destruction and removal of the papers after service of the subpoena—was " the past commission of a completed act which prior to the arrest and the proceedings to punish had reached such a stage of finality that it could not longer affect the proceedings of the Senate or any Committee thereof, and which, and the effects of which, had been undone long before the arrest."

The petition occupies, with exhibits, 100 pages of the printed record in this Court; but the only additional aver-

---

[1] Pursuant to Senate Resolution 349, 72nd Congress, Second Session.

ments essential to the decision of the question presented are, in substance, these: The Senate had appointed the Special Committee to make " a full, complete and detailed inquiry into all existing contracts entered into by the Postmaster General for the carriage of air mail and ocean mail." MacCracken had been served, on January 31, 1934, with a subpoena *duces tecum* to appear " instanter " before the Committee and to bring all books of account and papers " relating to air mail and ocean mail contracts." The witness appeared on that day; stated that he was a lawyer, member of the firm of MacCracken & Lee, with offices in the District; that he was ready to produce all papers which he lawfully could; but that many of those in his possession were privileged communications between himself and corporations or individuals for whom he had acted as attorney; that he could not lawfully produce such papers without the client first having waived the privilege; and that, unless he secured such a waiver, he must exercise his own judgment as to what papers were within the privilege. He gave, however, to the Committee the names of these clients; stated the character of services rendered for each; and, at the suggestion of the Committee, telegraphed to each asking whether consent to disclose confidential communications would be given. From some of the clients he secured immediately unconditional consent; and on February 1, produced all the papers relating to the business of the clients who had so consented.

On February 2, before the Committee had decided whether the production of all the papers should be compelled despite the claims of privilege, MacCracken again appeared and testified as follows: On February 1, he personally permitted Givven, a representative of Western Air Express, to examine, without supervision, the files containing papers concerning that company; and authorized

him to take therefrom papers which did not relate to air mail contracts. Givven, in fact, took some papers which did relate to air mail contracts. On the same day, Brittin, vice-president of Northwest Airways, Inc., without Mac-Cracken's knowledge, requested and received from his partner, Lee, permission to examine the files relating to that company's business and to remove therefrom some papers stated by Brittin to have been dictated by him in Lee's office and to be wholly personal and unrelated to matters under investigation by the Committee. Brittin removed from the files some papers; took them to his office; and, with a view to destroying them, tore them into pieces and threw the pieces into a wastepaper basket.

Upon the conclusion of MacCracken's testimony on February 2, the Committee decided that none of the papers in his possession could be withheld under the claim of privilege.[2] Later that day MacCracken received from the rest of his clients waivers of their privilege; and thereupon promptly made available to the Committee all the papers then remaining in the files. On February 3, (after a request therefor by MacCracken) Givven restored to the files what he stated were all the papers taken by him. The petition does not allege that any of the papers taken by

[2] Upon the conclusion of the hearing on February 2, the Committee made to the Senate a report (No. 254) setting forth the facts elicited. Thereupon the Senate, by Resolution No. 169, directed a warrant to issue, commanding the Sergeant-at-Arms to take MacCracken into custody before the bar of the Senate; "to bring with him the correspondence . . . referred to and then and there to answer such questions pertinent to the matter under inquiry . . . as the Senate may propound. . . ." The warrant was served on February 2, 1934; MacCracken was paroled in the custody of his counsel to appear at the bar of the Senate at noon, February 5, 1934. On that day (in view of Resolution No. 172) he was released from custody under Resolution No. 169; and the proceedings under Resolution No. 169 are not here involved.

Brittin were later produced.[3]  It avers that, prior to the adoption of the citation for contempt under Resolution 172, MacCracken had produced and delivered to the Senate of the United States " to the best of his ability, knowledge and belief, every paper of every kind and description in his possession or under his control, relating in any way to air mail and ocean mail contracts; [and that] on February 5, 1934 . . . all of said papers were turned over and delivered to said Senate Committee and since that date they have been, and they now are, in the possession of said Committee."

*First.* The main contention of MacCracken is that the so-called power to punish for contempt may never be exerted, in the case of a private citizen, solely *qua* punishment.  The argument is that the power may be used by the legislative body merely as a means of removing an existing obstruction to the performance of its duties; that the power to punish ceases as soon as the obstruction has been removed, or its removal has become impossible; and hence that there is no power to punish a witness who, having been requested to produce papers, destroys them after service of the subpoena.  The contention rests upon a misconception of the limitations upon the power of the Houses of Congress to punish for contempt.  It is true that the scope of the power is narrow.  No act is so punish-

---

[3] But the brief for MacCracken, the respondent, states: " By February 6th every recoverable paper involved in the Brittin incident had been recovered and delivered to the Senate."  The reference in the brief is to the fact (to which attention was called by counsel for Jurney) that, after MacCracken and Brittin had testified, post office inspectors, acting for the Committee, searched the sacks of waste papers taken from Brittin's office; and succeeded in collecting most of the pieces of the papers which Brittin destroyed.  By pasting these pieces together they were able to restore for the Committee most of the papers removed from the Northwest Airways, Inc., files.  (Senate Document No, 162, 73rd Cong., 2nd Sess., pp. 106–116.)

able unless it is of a nature to obstruct the performance of the duties of the legislature. There may be lack of power, because, as in *Kilbourn* v. *Thompson,* 103 U. S. 168, there was no legislative duty to be performed; or because, as in *Marshall* v. *Gordon,* 243 U. S. 521, the act complained of is deemed not to be of a character to obstruct the legislative process. But, where the offending act was of a nature to obstruct the legislative process, the fact that the obstruction has since been removed, or that its removal has become impossible is without legal significance.

The power to punish a private citizen for a past and completed act was exerted by Congress as early as 1795;[4] and since then it has been exercised on several occasions.[5] It was asserted, before the Revolution, by the colonial

---

[4] Robert Randall and Charles Whitney were taken into custody by the House of Representatives, on December 28, 1795, on charges of attempting to bribe some of its members. Whitney was discharged on January 7, 1796, before trial. Randall, however, on January 6, was found guilty of a contempt and of a breach of the privileges of the House, was reprimanded by the Speaker, and was committed to the custody of the Sergeant-at-Arms until further order of the House. On January 13, his petition to be discharged from custody was granted, upon payment of fees. 5 Annals, 4th Cong., 1st Sess., 166–195, 232, 200–229, 237, 243.

[5] In 1832, Samuel Houston, having been arrested and tried by the House of Representatives for assaulting a member, was reprimanded and discharged on payment of fees. 8 Debates, 22nd Cong., 1st Sess., 2512–2620, 2810–3022. In 1865, A. P. Field was taken into custody for assaulting a member and was reprimanded by the Speaker. 70 Globe, 38th Cong., 2nd Sess., 991. So too, Charles C. Glover, in 1913. Cong. Rec., 63rd Cong., 1st Sess., 281–283, 499–503, 1431–1453. In 1870, Patrick Wood, for a similar offence, was imprisoned for three months by order of the House. 94 & 95 Globe, 41st Cong., 2nd Sess., 4316–17, 4847, 5253, 5301. In 1795, Sen. James Gunn, whose challenge of a member of the House was considered a breach of privilege, escaped with an apology. 5 Annals, 4th Cong., 1st Sess., 786–790, 795–798. See Shull, Legislative Contempt—An Auxiliary Power of Congress (1934) 8 Temple L. Quart. 198.

assemblies, in imitation of the British House of Commons; and afterwards by the Continental Congress and by state legislative bodies.[6] In *Anderson* v. *Dunn,* 6 Wheat. 204, decided in 1821, it was held that the House had power to punish a private citizen for an attempt to bribe a member. No case has been found in which an exertion of the power to punish for contempt has been successfully challenged on the ground that, before punishment, the offending act had been consummated or that the obstruction suffered was irremediable. The statements in the opinion in *Marshall* v. *Gordon, supra,* upon which MacCracken relies, must be read in the light of the particular facts. It was there recognized that the only jurisdictional test to be applied by the court is the character of the offence; and that the continuance of the obstruction, or the likelihood of its repetition, are considerations for the discretion of the legislators in meting out the punishment.

Here, we are concerned, not with an extension of congressional privilege, but with vindication of the estab-

---

[6] See Potts, Power of Legislative Bodies to Punish for Contempt (1926) 74 U. of Pa. L. Rev. 691, 700–719; Clarke, Parliamentary Privilege in the American Colonies, Essays in Colonial History Presented to Charles McLean Andrews (1931), pp. 124, *et seq.;* May, Law and Usage of Parliament (5th ed., 1863), pp. 83–97. Since the American Revolution, it has been held that colonial assemblies of the British Empire, have, in the absence of express grant, and " without any usage, any acquiescence, or any sanction of the Courts of Law," no power to adjudicate upon, or punish for, contempts, *Kielley* v. *Carson,* 4 Moore P. C. 63; even when the contempt is committed in the presence of the Assembly by one of its own members. *Doyle* v. *Falconer,* L. R. 1 P. C. 328; *Barton* v. *Taylor,* 11 App. Cas. 197; compare *Whitcomb's Case,* 120 Mass. 118, 122. But upon some colonial assemblies contempt powers as broad as those of the British House of Commons have been conferred. Compare *Dill* v. *Murphy,* 1 Moore P. C. (N. S.) 487; *The Speaker of the Legislative Assembly of Victoria* v. *Glass,* L. R. 3 P. C. 560; *Fielding* v. *Thomas,* (1896) App. Cas. 600.

lished and essential privilege of requiring the production of evidence. For this purpose, the power to punish for a past contempt is an appropriate means.[7]  Compare *Ex parte Nugent*, Fed. Cas. No. 10,375; *Stewart* v. *Blaine*, 1 MacArthur 453. The apprehensions expressed from time to time in congressional debates, in opposition to particular exercises of the contempt power, concerned not the power to punish, as such, but the broad, undefined privileges which it was believed might find sanction in that power.[8]  The ground for such fears has since been effectively removed by the decisions of this Court which hold that assertions of congressional privilege are subject to judicial review, *Kilbourn* v. *Thompson, supra;* and that the power to punish for contempt may not be extended to slanderous attacks which present no immediate obstruction to legislative processes. *Marshall* v. *Gordon, supra.*

---

[7] The many instances in which the Houses of Congress have punished contumacious witnesses for contempt are collected and discussed in Eberling, Congressional Investigations (1928). See, too, Dimock, Congressional Investigating Committees (1929); Landis, Constitutional Limitations on the Congressional Power of Investigation (1926) 40 Harv. L. Rev. 153; compare May, *op. cit., supra,* pp. 407, 408. Witnesses found guilty of prevaricating before investigating committees have been imprisoned by the House of Commons under circumstances indicating that there was no thought of inducing further testimony, but only of punishing for the past offence. See case of Charles Woolfen, 112 Comm. Jour. 354, 372, 377; of Acton, Sheriff of London, Petyt, Miscellanea Parliamentaria (1680) p. 108; of Randolph Davenport, *Id.,* p. 120.

[8] See remarks of Sen. Charles Pinckney in the case of the Editor of the Aurora, 10 Annals, 6th Cong., 1st Sess., 69; of Rep. Barbour and Rep. Poindexter in the case of Colonel Anderson, 32 Annals, 15th Cong., 1st Sess., 624, 654; of Rep. Polk in the case of Samuel Houston, 8 Debates, 22nd Cong., 1st Sess., 2512; of Sen. Sumner in the case of Thaddeus Hyatt, 53 Globe, 36th Cong., 1st Sess., 1100; see, too, Jefferson's Manual, §§ 293–299.

*Second.* The power of either House of Congress to punish for contempt was not impaired by the enactment in 1857 of the statute, R. S. § 102, making refusal to answer or to produce papers before either House, or one of its committees, a misdemeanor. Compare *Sinclair* v. *United States,* 279 U. S. 263. The statute was enacted, not because the power of the Houses to punish for a past contempt was doubted, but because imprisonment limited to the duration of the session was not considered sufficiently drastic a punishment for contumacious witnesses.[9] That the purpose of the statute was merely to supplement the power of contempt by providing for additional punishment was recognized in *In re Chapman,* 166 U. S. 661, 671–672: " We grant that Congress could not divest itself or either of its Houses, of the essential and inherent power to punish for contempt in cases to which the power of either House properly extended; but because Congress, by the Act of 1857, sought to aid each of the Houses in discharge of its constitutional functions, it does not follow that any delegation of the power in each to punish for contempt was involved; and the statute is not open to objection on that account." Punishment, purely as such, through contempt proceedings, legislative or judicial, is not precluded because punishment may also be inflicted for the same act as a statutory offense. Compare *Ex parte Hudgings,* 249 U. S. 378, 382.[10] As was said in *In re Chapman, supra,* " the same act may be an offence against one jurisdiction and an offence against another; and indictable statutory offences may be punished as such while the offenders may likewise be sub-

---

[9] See remarks of Rep. Orr, 43 Globe, 34th Cong., 3rd Sess., 404, 405.

[10] Samuel Houston was in fact indicted, convicted and fined in the criminal court of the District of Columbia on account of the same assault for which he was reprimanded by the House. See 2 Ops. Atty. Gen. 655.

jected to punishment for the same acts as contempts, the two being *diverso intuito* and capable of standing together." ·

*Third.* MacCracken contends that he is not punishable for contempt, because the obstruction, if any, which he caused to legislative processes, had been entirely removed and its evil effects undone before the contempt proceedings were instituted. He points to the allegations in the petition for *habeas corpus* that he had surrendered all papers in his possession; that he was ready and willing to give any additional testimony which the Committee might require; that he had secured the return of the papers taken from the files by Givven, with his permission; and that he was in no way responsible for the removal and destruction of the papers by Brittin. This contention goes to the question of guilt, not to that of the jurisdiction of the Senate. The contempt with which Mac-Cracken is charged is " the destruction and removal of certain papers." Whether he is guilty, and whether he has so far purged himself of contempt that he does not now deserve punishment, are the questions which the Senate proposes to try. The respondent to the petition did not, by demurring, transfer to the court the decision of those questions. The sole function of the writ of *habeas corpus* is to have the court decide whether the Senate has jurisdiction to make the determination which it proposes. Compare *Barry* v. *United States ex rel. Cunningham,* 279 U. S. 597; *Henry* v. *Henkel,* 235 U. S. 219; *Matter of Gregory,* 219 U. S. 210.

The judgment of the Court of Appeals should be reversed; and that of the Supreme Court of the District should be affirmed.

*Reversed.*

Mr. Justice McReynolds took no part in the consideration or decision of this case.