STATE EX REL. GROPPI, Petitioner, v. LESLIE, Sheriff, Respondent.*

*No. State 122. Argued October 10, 1969.—Decided October 17, 1969.*

(Also reported in 171 N. W. 2d 192.)

* Motion for rehearing denied, without costs, on December 19, 1969.

284

288

For the petitioner there was oral argument by *James M. Shellow, William M. Coffey,* and *Robert H. Friebert,* all of Milwaukee.

For the respondent there was oral argument by *Robert W. Warren,* attorney general.

PER CURIAM. On September 29, 1969, during a regular meeting of the Assembly just prior to the commencement of a special session called by the governor, James E. Groppi led a crowd of noisy protesters into the state capitol building and proceeded to "take over" the Assembly chamber to protest his disagreement with cuts in the state budget for certain welfare programs. The Assembly was unable to proceed with its legislative duties. We take judicial notice that Groppi publicly stated in the Assembly to his cheering supporters, in effect, that they had captured the capitol and intended to stay until they got what they wanted, and that Groppi vowed from the speaker's stand in the Assembly to remain there until the legislature restored funds for welfare recipients. The occupation of the Assembly by Groppi and the protesters lasted from approximately midday to well toward midnight. Thereafter the protesters were kept out of the state capitol building by police, sheriffs, and the national guard. The Assembly convened on October 1, 1969, and passed a resolution [1] finding the petitioner in contempt

---

[1] "Assembly Resolution 6, Special Session.

"Citing James E. Groppi for contempt of the Assembly and directing his commitment to the Dane county jail.

for "disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings." The Assembly ordered his imprisonment for the duration of the 1969 regular session of the Wisconsin legislature, or for six months, whichever occurred earlier.

Counsel for the petitioner has made it clear he is not contending the Assembly is without authority to deal directly by way of summary contempt proceedings with acts committed in its immediate view and tending to disrupt its proceedings. What is argued is that the contempt proceedings no longer can be summary and the safeguards afforded defendants in criminal prosecutions by the United States Constitution must now be afforded in contempt proceedings involving contempts committed in the presence of the legislature. In such proceedings the peti-

---

"In that James E. Groppi led a gathering of people on September 29, 1969, which by its presence on the floor of the Assembly during a meeting of the 1969 regular session of the Wisconsin Legislature in violation of Assembly Rule 10 prevented the Assembly from conducting public business and performing its constitutional duty; now, therefore, be it

*"Resolved by the Assembly*, That the Assembly finds that the above-cited action by James E. Groppi constituted 'disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings' and is an offense punishable as a contempt under Section 13.26 (1) (b) of the Wisconsin Statutes and Article IV, Section 8 of the Wisconsin Constitution and therefore:

"(1) Finds James E. Groppi guilty of contempt of the Assembly; and

"(2) In accordance with Sections 13.26 and 13.27 of the Wisconsin Statutes, orders the imprisonment of James E. Groppi for a period of 6 months, or for the duration of the 1969 regular session, whichever is briefer, in the Dane county jail and directs the sheriff of Dane county to seize said person and deliver him to the jailer of the Dane county jail; and, be it further

*"Resolved*, That the Assembly directs that a copy of this resolution be transmitted to the Dane county district attorney for further action by him under Section 13.27 (2) of the Wisconsin Statutes; and, be it further

*"Resolved*, That the attorney general is respectfully requested to represent the Assembly in any litigation arising herefrom."

tioner claims he has a right to a hearing of some kind, to be represented by counsel, to compulsory process for the attendance of witnesses, to be informed of the nature and cause of the accusations, to confront his accusers, and to proceed with a defense denying the accusation or giving an explanation for his conduct. This argument equates a finding of contempt and imprisonment by the legislature with a finding of guilt in a criminal trial and criminal punishment. Basically, the argument ignores the purpose and nature of the legislative proceeding and considers imprisonment by the legislative summary contempt process is for a crime and therefore the process must include the constitutional safeguards of criminal procedure in a court of law. A brief review of the origin, the basis, and the scope of the legislative power of summary procedure for contempt committed in its presence is necessary.

From the time of the adoption of our state constitution in 1848, it has been provided in art. IV, sec. 8, that "each house may . . . punish for contempt and disorderly conduct . . . ." In keeping with the recognized rules of construction of state constitutions, we consider this article not to be a grant of contempt power but a recognition and affirmation of the historic and inherent contempt power possessed by the legislative branch of our tripartite government and of the British Parliament. Historically, this contempt power has been considered one of self-defense and of self-preservation. Likewise, we do not consider secs. 13.26 [2] and 13.27,[3] Stats., as granting any

[2] "13.26 Contempt. (1) Each house may punish as a contempt, by imprisonment, a breach of its privileges or the privileges of its members; . . .

"(b) Disorderly conduct in the immediate view of the house and directly tending to interrupt its proceedings. . . .

"(2) The term of imprisonment a house may impose under this section shall not extend beyond the same session of the legislature."

[3] "13.27 Punishment for contempt. (1) Whenever either house of the legislature orders the imprisonment of any person for

contempt power to the legislature but as regulation of that power. The forerunners of these sections were adopted in 1849 shortly after the adoption of the constitution. In the light of the law on contempts as it then existed and by their terms, these sections granted no power but limit and prescribe the exercise of the legislative contempt power. It was an expression of the legislative intent to limit its own power to less than that declared by the constitution and less than that exercised by the Parliament. The contempt power in sec. 13.26 was restricted to enumerated offenses and the imprisonment was limited to prevent the occurrence of such offenses during the session of the legislature. Punishment for the sake of punishment or "to teach a lesson" was not provided and was not the object of this confinement. Incarceration by the legislature was not an end in itself but a means to an end, *i.e.*, the freedom to perform its public duties which could only be obtained by imprisonment of the intruders. Assembly Rule 10, which Groppi and his followers were found to violate, provides who has floor privileges when the Assembly is in session. Needless to say, neither Groppi nor his followers qualified or had permission when they forcefully took over the Assembly. However, in sec. 13.27 it was provided as was customary at the time the constitution was adopted that the acts constituting a contempt were also to be a misdemeanor which after the adjournment of the legislature but not during the

contempt under s. 13.26 such person shall be committed to the Dane county jail, and the jailer shall receive such person and detain him in close confinement for the term specified in the order of imprisonment, unless he is sooner discharged by the order of such house or by due course of law.

"(2) Any person who is adjudged guilty of any contempt of the legislature or either house thereof shall be deemed guilty also of a misdemeanor, and after the adjournment of such legislature, may be prosecuted therefor in Dane county, and may be fined not more than $200 or imprisoned not more than one year in the county jail."

session could be prosecuted. A penalty of $200 or imprisonment of not more than one year in a county jail was provided.

We point out the resolution of the Assembly did not give James E. Groppi the maximum confinement since it confined him until the end of the session of the legislature but not exceeding a period of six months, whichever event occurred first. Thus if the session of the legislature lasted longer than six months James E. Groppi would still be released from confinement.

The history of the direct contempt power by Parliament and the courts of England prior to the adoption of our federal constitution has been a subject of confusing scholarship and acceptance.[4] It is certain the House of Commons possessed authority to deal directly with contempts without the intervention of courts, including the power to impose prolonged terms of imprisonment. It has been suggested this power rested upon an assumed blending of the legislature and judicial authority possessed by Parliament when the House of Lords and the Commons were one and continued to operate after the division of the Parliament into the two houses.

Nevertheless, prior to the adoption of our federal constitution some states recognized the necessity of the legislature to have the power of contempt even though one might consider it a judicial power and granted or recognized the power in the legislature. This was done notably in Maryland and Massachusetts, whose state constitutions prior to 1787 recognized in the houses of the legislature the power to find persons guilty of contempt committed in their presence. Maryland Constitution of 1776, article XII; Massachusetts Constitution of 1780, article second, chapter 1, section 3, articles X and XI.

---

[4] *See* Holt, *Privilege and Contempt;* James, *The Power of Congress to Punish Contempts and Breaches of Privilege;* Fox, *The History of Contempt of Court;* Frankfurter & Landis, *Power to Regulate Contempts,* 37 Harvard L. Rev. (1924), 1010.

In considering these state constitutions, the United States Supreme Court in *Marshall v. Gordon* (1917), 243 U. S. 521, 535, 37 Sup. Ct. 448, 61 L. Ed. 881, stated the object "could only have been to recognize the right of the legislative power to deal with the particular acts without reference to their violation of the criminal law and their susceptibility of being punished under that law because of the necessity of such a legislative authority to prevent or punish the acts independently because of the destruction of legislative power which would arise from such acts if such authority was not possessed." Almost contemporaneously with the adoption of the federal constitution similar provisions were written into other state constitutions. *See* footnote 1, page 536, *Marshall v. Gordon, supra.*

In several United States Supreme Court cases, it has been held that while the inherent contempt power of the House of Commons could not exist in the Congress of the United States because of its delegated powers, nevertheless Congress did have limited implied powers of contempt ancillary and incidental to the legislative powers granted Congress. The first such case so holding was *Anderson v. Dunn* (1821), 19 U. S. (6 Wheat.) 204, 5 L. Ed. 242. This case squarely held that from the power to legislate there was to be implied the right of Congress to preserve itself, *i.e.,* to deal by way of contempt with direct obstructions to its legislative duties.

While in *Kilbourn v. Thompson* (1881), 103 U. S. 168, 26 L. Ed. 377, the court denied to Congress the judicial-legislative power of contempt possessed by the House of Commons, and reserved the question of the right of an implied authority for contempt in the legislature and incidental to the legislative power. But in *In Re Chapman* (1897), 166 U. S. 661, 17 Sup. Ct. 677, 41 L. Ed. 1154, the existence of an implied legislative authority to deal with direct contempts was upheld.

The court in *Anderson v. Dunn, supra,* was almost prophetic in describing what could happen if a legislative body did not have the power of contempt to protect itself. It said, page 227, "The unreasonable murmurs of individuals against the restraints of society, have a direct tendency to produce that worst of all despotisms, which makes every individual the tyrant over his neighbour's rights." And the United States Supreme Court goes on to state, "the total annihilation of the power of the House of Representatives to guard itself from contempts . . . leaves it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may meditate against it." In considering the extent of the contempt power which a legislative body may assume upon the principle of self-preservation, the court stated its much quoted test, page 230, "Analogy, and the nature of the case, furnish the answer—*'the least possible power adequate to the end proposed;'* which is the power of imprisonment." Since the contempt power was only to be used to protect the legislature in its deliberation, the duration of the confinement was to be limited to what was necessary and the court held, "that imprisonment must terminate with that adjournment."

Some forty-seven years later the Wisconsin legislature apparently mindful of this case used its first opportunity to so restrict its power of contempt in what is now sec. 13.26, Stats., to limit contempt to self-protection. Thus Wisconsin, like many other American legislative bodies, did not pretend it possessed the unlimited power of imposing unlimited punishment which constituted the leading feature when contempt originated in the houses of Parliament in England but enacted sec. 13.27 exercising its legislative power to create a misdemeanor enforceable in a court of law. This restriction of the legislative power of contempt is a recognition of the "minimum of necessity" principle. Universally in the United States it is recognized this power of Congress and of a state legisla-

ture is a narrow one. *Jurney v. MacCracken* (1935), 294 U. S. 125, 147, 55 Sup. Ct. 375, 79 L. Ed. 802. Thus, it has been aptly said of this legislative power in distinguishing it from the judicial power of contempt that necessity initiated it, justified it, and fixes its limits. Dangel, *Contempt,* secs. 43 and 44; *see* 17 Am. Jur. 2d, *Contempt—Legislative Bodies,* p. 103, sec. 119.

We make no reference by analogy to the judicial power of the courts to punish for direct contempt which is of a different scope and nature. True, the judicial power has been said by this court in *State ex rel. Attorney General v. Circuit Court for Eau Claire County* (1897), 97 Wis. 1, 8, 72 N. W. 193, to be "necessarily inherent in such a court, and arises by implication from the very act of creating the court." We also recognized the judicial contempt power could be "regulated, and the manner of its exercise prescribed, by statute, but certainly it cannot be entirely taken away, nor can its efficiency be so impaired or abridged as to leave the court without power to compel the due respect and obedience which is essential to preserve its character as a judicial tribunal." In characterizing the nature of the judicial contempt power, the court said, "It is, and must be, a power arbitrary in its nature, and summary in its execution. It is, perhaps, nearest akin to despotic power of any power existing under our form of government. Such being its nature, due regard for the liberty of citizens imperatively requires that its limits be carefully guarded, so that they be not overstepped. It is important that it exist in full vigor; it is equally important that it be not abused. The greater the power, the greater care required in its exercise. Being a power which arises and is based upon necessity, it must be measured and limited by the necessity which calls it into existence."

In respect to the judicial power of contempt, there has raged for many years a storm over the summary procedure for contempts committed in the presence of the

court. An explanation of the nature of the judicial power is important here to highlight what we think to be a distinction between the judicial power of contempt and the legislative power of contempt.

The history, the scope, and the extent of judicial power have been well explained in the leading cases of the United States Supreme Court.[5] Under the judicial contempt power, a contemnor is imprisoned, not to prevent him from continuing to interfere with the judicial function of the court in the future but to punish him for having completed a contemptuous act in the presence of the court. This is punishment necessary to maintain the dignity, decorum, and respect for the court. This objective admittedly is also found in punishment for some crimes. In contrast, the legislative power of contempt, restricted as it is to prevent the contemnor from interfering with the functions of the legislature, is more in the nature of what is known as civil contempt. Its function is not to punish for a past deed but to prevent threatened conduct which interferes with the proper function of the legislative body. *Marshall v. Gordon, supra.*

While in our representative government the legislature does not and need not have the power of punishment, the Assembly and the Senate which are composed of persons chosen and elected by the people, who are answerable directly to the people, who are removable directly by the people through the elective process and who conduct public hearings to ascertain the will of the people, do need enough power to properly protect themselves and to properly discharge their constitutional responsibility.

The petitioner argues he has not been given a hearing or a trial in the legislature. This is true, but the question

[5] *Green v. United States* (1958), 356 U. S. 165, 78 Sup. Ct. 632, 2 L. Ed. 2d 672; *United States v. Barnett* (1964), 376 U. S. 681, 84 Sup. Ct. 984, 12 L. Ed. 2d 23; *Watkins v. United States* (1957), 354 U. S. 178, 77 Sup. Ct. 1173, 1 L. Ed. 2d 1273; *Gompers v. United States* (1914), 233 U. S. 604, 34 Sup. Ct. 693, 58 L. Ed. 1115.

is whether he is entitled to a hearing. What is there to hear? It is not denied that his acts were contemptuous. It is not denied that he obstructed the legislature and made it impossible for the governor of Wisconsin to address the Assembly on the very subject matter which was of concern to the protesters. When the petitioner stood at the rostrum of the Assembly and protesters crowded the aisles and stool on the legislators' desks, when the speaker of the Assembly was unable to restore any semblance of order, what need is there for witnesses to tell the Assembly as a body what it witnessed. These facts are not disputed by the petitioner in this proceeding.

We do not hold the action of the legislature is not reviewable in our courts and subject to correction. It is expressly provided in sec. 13.27, Stats., the contemnor may be discharged before his time by "the due course of law." The petitioner has not sought a hearing in this court or any court on the merits of the contempt issue. He has not offered any defense or denied his acts amounted to a contempt although this court in this proceeding allowed him to amend his complaint to present any matter he wished. The only issues presented dealt primarily with procedure, not with the issue of his innocence or with the merits of any defense. We think due process is satisfied when the courts are open to determine promptly any question concerning the merits of a contempt found to have been committed by summary process before a legislature for contempt committed in its presence.

The value of the necessity of the summary contempt power of the legislature in direct contempts must be balanced with the rights of individuals who run afoul and interfere with the proper functioning of their government. We think respect for lawful authority, the maintenance of order, the preservation and the right to exercise the legislative duties efficiently and without disruption and the recognition of other citizens' rights to have their

elected representatives conduct their proceedings demand that the limited legislative power to deal with contempts committed in its presence by summary procedure should so remain and be promptly reviewable by the judiciary at the instance of the contemnor.

We are not overlooking *Bloom v. Illinois* (1968), 391 U. S. 194, 88 Sup. Ct. 1477, 20 L. Ed. 2d 522, wherein the supreme court after some years of staving off an insistent attack on the summary power of the courts in judicial contempt held in one sweep of the sword that in matters involving imprisonment of over six months in direct judicial contempts, the contemnor was entitled to a jury trial. The opinion was not written upon a clean slate, but it did erase *Green v. United States, supra,* and *United States v. Barnett, supra,* holding a jury trial was not required in judicial cases of direct contempt, and with them, some 50 other cases holding there was no distinction for a jury trial based on the seriousness of the offense. But this distinction of petty crimes for jury trial purposes was made in *Duncan v. Louisiana* (1968), 391 U. S. 145, 88 Sup. Ct. 1444, 20 L. Ed. 2d 491, and applied to the states. By *Bloom,* it was applied to judicial contempts and while special mention of contempts in the presence of the court was made, the court concluded that a criminal contempt was like other crimes, "insofar as the right to jury trial is concerned." Thus a judicial contempt carrying a punishment of six months or less need not be tried by a jury. Such contempts carrying more than six-months imprisonment must be afforded a constitutional jury trial. This decision has engrafted the jury trial on Rule 42 of the Federal Rules of Criminal Procedure. We do not consider this case controlling legislative contempts because as pointed out in this opinion the confinement for legislative contempt is inherently not punishment and is different from either judicial contempt imprisonment or imprisonment for a crime.

Assuming but not deciding the rule of *Bloom v. Illinois, supra,* does apply to legislative contempts, this petitioner would not be entitled to a jury trial or a hearing before the legislature because the maximum term of confinement provided by the resolution of the Assembly does not exceed six months. We do not consider the effect of *Bloom* if the petitioner is prosecuted in a court for a misdemeanor after the termination of the session of the legislature. If a jury trial were required, it would be impracticable if not impossible to hold it before the Assembly. Under no reasoning does *Bloom* require a hearing in the legislature. If the petitioner is not entitled to a trial or hearing before the legislature, there is little need for an attorney, for the compelling of witnesses, or an explanation of his conduct, for these rights are necessarily dependent upon a hearing. The petitioners have cited no cases holding summary proceeding for direct contempt of a legislature to be unconstitutional and we have not found any. The only practical way a contempt in the presence of the legislature can be handled is by summary process reviewable by the judiciary. We think it is neither a necessary nor an acceptable construction of the constitution that a trial or a hearing be engrafted upon the legislative contempt power when the judiciary will immediately review the action of the legislature and has the power to grant adequate and appropriate relief.

The petitioner argues the Assembly resolution is a bill of attainder prohibited by the United States Constitution. There is no merit in this contention. The petitioner was not found guilty of a crime by legislative act. Nor is the resolution of the legislature a bill of pains and penalties. Both of these bills are the same in nature—a special act of the legislature inflicting punishment upon a person supposed to be guilty of a severe offense without a trial or a conviction in the ordinary

course of judicial proceedings. The penalty in the bill of attainder is death and in the bill of pains and penalties a milder degree of punishment less than death. *See* Black's Law Dictionary, bill of attainder. 11 Am. Jur., *Constitutional Law*, p. 1175, sec. 347.

The petitioner argues the resolution of the Assembly is invalid because the Assembly was not in a valid special session. He bases his argument on the premise the governor has no power to call a special session of the legislature before the legislature in a general session has adjourned *sine die*. Art. IV, sec. 11 of the Wisconsin Constitution, provides:

"The legislature shall meet at the seat of government at such time as shall be provided by law unless convened by the governor in special session, and when so convened no business shall be transacted except as shall be necessary to accomplish the special purposes for which it was convened."

The constitution does not limit the power of the governor to call special sessions only when the legislature is not in session. The purpose of a special session is to accomplish a special purpose for which it has convened. To deny the governor the power to call a special session while the legislature is in general session would in effect deny the governor the right to call the legislature into session to give priority consideration to those items he claims are of immediate statewide concern. This power of the governor is a part of the checks and balances in our tripartite form of government.

We hold the Assembly exercised its contempt power validly in finding the petitioner in contempt and, therefore, the petition of James E. Groppi for a writ of habeas corpus is hereby denied.