**James E. GROPPI, Petitioner-Appellee,**

**v.**

**Jack LESLIE, Sheriff of Dane County, Respondent-Appellant.**

**No. 18538.**

United States Court of Appeals, Seventh Circuit.

Jan. 6, 1971.

Robert W. Warren, Atty. Gen., David J. Hanson, Sverre O. Tinglum, Asst. Attys. Gen., Madison, Wis., for appellant.

Percy L. Julian, Jr., Madison, Wis., William M. Coffey, Michael J. Zimmer, Milwaukee, Wis. (Robert J. Lerner, John D. Murray, Milwaukee, Wis., Steven H. Steinglass, Patricia D. McMahon, Milwaukee, Wis., of counsel), for appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, CUMMINGS, KERNER, PELL and STEVENS, Circuit Judges.[1]

1. Thomas E. Fairchild, Circuit Judge, has disqualified himself, noting that he was a member of the three-judge court which decided Groppi v. Froehlich, 311 F.Supp. 765 (W.D.Wis.1970), a closely related case arising out of the same events as Groppi v. Leslie, 311 F.Supp. 772 (W.D. Wis.1970), and heard at the same time.

PELL, Circuit Judge.

This matter being before the court *en banc* following reargument pursuant to the granting of Groppi's petition for rehearing, we are not persuaded that the result, and reasoning in support thereof, reached by the panel originally hearing this appeal, as set forth in the court's decision of October 28, 1970, is other than correct.

■ The basic and simple issue remains whether the judicial power of summary punishment[2] for direct contempt is constitutionally exercisable by the legislative branch. We hold that it is for the reasons advanced in the original opinion of this court, which opinion we now adopt and confirm. Groppi v. Leslie, 436 F.2d 326 (7th Cir. October 28, 1970).

While the resolution adopted by the Wisconsin Assembly might well have spelled out the alleged misconduct of Groppi with greater particularity, it nevertheless is couched in terms of ultimate fact which we do not find lacking in adequate specificity. There is no indication to us that the contemnor failed to be fully and explicitly informed of the charge leveled against him and the exact nature of his misconduct.

Our decision is reached on the narrow issue before us, involving direct interference with "conducting public business" in "the immediate view of the legislative body." We do not purport to reach any decision on the matter of contemptuous behavior occurring outside the legislative chamber itself.

Other means for punishing contempts are available to the legislature and resort to such other procedures may be found sufficiently efficacious in the future. We here hold, however, that the basic public need for inviolability of the legislative processes of our government dictates the availability of the power of summary contempt punishment to the legislative branch. The Wisconsin legislature has seen fit in the circumstances of the case before it to exercise that power and we do not deem it in the public interest to interfere.

■ It is to be noted that Groppi's term of imprisonment under the resolution does not extend beyond the end of the legislative term, i. e., January 7, 1971. Both petitioner's and respondent's counsel have argued that the issue here involved is not mooted by this fact. This is our opinion also. See United States ex rel. Lawrence v. Woods, 432 F.2d 1073, 1074–1075 (7th Cir. 1970).

Reversed.

STEVENS, Circuit Judge, with whom SWYGERT, Chief Judge, and KILEY, Circuit Judge, join, dissenting.

At no time in this proceeding has petitioner asserted any claim of innocence, or any claim that his sentence was excessive. It may be assumed, as the Wisconsin Supreme Court plainly stated, that any such claim would have been promptly and fairly heard in some form of post conviction trial.[1] As the disposition of an isolated controversy, therefore, no one could criticize this court's judgment as unfair or unreasonable.

The case, however, must be decided in the context of our legal traditions. It raises only a procedural issue, but in my judgment that issue is of fundamental importance and requires that petitioner's conviction be set aside. *Cf.* Rex v. Justices of Bodmin [1947] 1 K.B. 321.

The Fourteenth Amendment to the United States Constitution limits the procedures which a state may employ prior to the imprisonment of any person. The applicable clause states: "* * nor shall any State deprive any person of life, liberty, or property, without due process of law." One of the oldest and most consistently accepted maxims in our legal tradition is the proposition that "no man shall be punished before he has had an opportunity of being heard." The

<hr/>

2. See Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888).

1. See State ex rel. Groppi v. Leslie, 44 Wis.2d 282, 297, 171 N.W.2d 192 (1969).

King v. Benn and Church, 6 T.R. 198 (1795) (Lord Kenyon, Ch. J.) ; see United States v. Galante, 298 F.2d 72, 77 (2d Cir. 1962) (Friendly, J., dissenting).

The procedure which Wisconsin employed to deprive the petitioner of his liberty violated that ancient maxim. On October 1, 1969, without any prior notice to petitioner, and without giving him or his counsel an opportunity to be present or to be heard, the Wisconsin Assembly cited him for contempt, found him guilty of an offense which had been committed two days earlier, and sentenced him to imprisonment.[2] Although I recognize that the due process clause tolerates flexible procedures in varying situations,[3] in my opinion the label "legislative contempt" does not exclude this *ex parte* conviction from the coverage of the Fourteenth Amendment.

Disorderly conduct on the floor of a legislative body is a well recognized species of legislative contempt.[4] Historically acts of violence,[5] like other legislative contempts such as attempted bribery,[6] refusal to answer questions or produce documents before a legislative

2. That legislative finding not only deprived petitioner of his liberty; it also had a material impact on his procedural rights. Even assuming the availability of a post conviction remedy in which petitioner could have presented evidence or argument denying the rather vague charge in the resolution, the legislative finding eliminated his presumption of innocence and shifted the burden of proof. It would have been necessary for him to go forward with the task of proving a negative before he heard the evidence against him. As a practical matter the value of his privilege against self-incrimination and of his right to be confronted with the witnesses against him would have been debased, if not destroyed entirely. .

3. "Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between man and man, and more particularly between the individual and government, 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 643, 95 L.Ed. 817 (Frankfurter, J. *concurring*).

4. The Supreme Court decision which first upheld the power of Congress to punish contempts treated disorderly conduct in the presence of a legislative body as an established species of legislative contempt. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 217, 228, 5 L.Ed. 242; see Marshall v. Gordon, 243 U.S. 521, 543–544, 37

S.Ct. 448, 61 L.Ed. 881; Shull, Legislative Contempt—An Auxiliary Power of Congress, 8 Temp.L.Q. 198, 202–203 (1934).

5. In 1865, A. P. Field was reprimanded by the Speaker of the House and discharged from custody after a trial before a committee of the House at which he was found guilty of assaulting and wounding a member with a knife. Cong.Globe, 38th Cong., 2nd Sess. 991 (1865). In 1832, Sam Houston was arrested and tried before the House of Representatives for assaulting a member of the House, 8 Debates, 22nd Cong., 1st Sess. 2512–2620, 2810–3022. Perhaps the most famous instance of violence directed against a member of Congress occurred in 1856. Brooks, a member of the House of Representatives from South Carolina, who was offended by a speech, attacked Senator Charles Sumner in the Senate Chambers after adjournment, and beat him with a cane inflicting serious injuries. The Senate determined that the matter properly should be punished by the House, and a hearing was conducted by a Committee of the House which afforded Brooks the opportunity to appear and contest the evidence against him. H.R.Rep.No.182, 34th Cong., 1st Sess. (1856).

6. Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 5 L.Ed. 242, apparently involved an attempt to bribe a member of the House. See 19 U.S. at 215, 5 L.Ed. 242; Kilbourn v. Thompson, 103 U.S. 168, 196, 26 L.Ed. 377. The contemnor was brought before the bar of the House and permitted to present a defense, 19 U.S. at 209–210, 5 L.Ed. 242. In 1795 Robert Randall was tried by the House on a charge of attempting to bribe a member and found guilty of contempt, 5 Annals, 4th Cong., 1st Sess. 166–195, 232, 200–229, 237, 243.

committee,[7] and the destruction of subpoenaed documents,[8] have been prosecuted by the Legislature itself. In such cases the accused has been brought before the bar of the House and given an opportunity to speak in his own defense before any punishment was imposed. As this type of proceeding was no doubt somewhat cumbersome, and since the duration of any imprisonment was limited to the remainder of the legislative session, Congress long ago provided for the prosecution of contempts in judicial proceedings.[9] Apparently Congress never considered the possibility of avoiding the inconvenience of a prolonged legislative hearing by simply eliminating the accused's traditional opportunity to be heard in his own defense.[10]

Prior to October 1, 1969, no American legislature had found it necessary to employ *ex parte* procedures to punish disorderly or other contemptuous conduct. The fact that the exercise of summary contempt powers has been accepted as a necessary and appropriate aspect of our

judicial processes does not support an argument that the Wisconsin Legislature needs or possesses like powers. Indeed, a comparison of the legislative and judicial experience with contempts leads to a contrary conclusion.

It is the business of judges to decide particular cases, to make determinations of guilt or innocence, to listen to arguments in mitigation, and to impose appropriate punishments. Although occasional abuses have required correction on review, by and large the judicial contempt power has proved useful in advancing the orderly disposition of litigation.[11] The conclusion that judges can safely be trusted with such powers is supported by analysis of the judicial function and by years of experience. The multitude of judicial contempt cases which have been decided in our history apparently include none in which a judge, two days after the offense, without giving the contemnor notice or any opportunity to be heard, entered an *ex parte* order sentencing him to prison.[12]

7. McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (refusal to appear; apparently Daugherty was discharged from custody by a Federal District Court in Ohio before he could be brought before the bar of the Senate, 273 U.S. at 154, 47 S.Ct. 319); Kilbourn v. Thompson, 103 U.S. 168, 26 L. Ed. 377 (refusal to answer a question and produce documents; Kilbourn was brought before the bar of the House and allowed to present a defense, 103 U.S. at 174, 26 L.Ed. 377).

8. Jurney v. MacCracken, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802 (destruction and removal of subpoenaed documents; MacCracken declined to appear before the bar of the Senate for trial, 294 U.S. at 143, 152, 55 S.Ct. 375).

9. 2 U.S.C. § 192 makes the refusal to testify before a committee of Congress a misdemeanor. The original provision, 11 Stat. 155, was enacted in 1857. See Jurney v. MacCracken, 294 U.S. 125, 151, 55 S.Ct. 375; see also In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L. Ed. 1154. In recent years Congress has relied upon the statutory procedure. See Goldfarb, The Contempt Power (1963), p. 43.

10. Wisconsin's concern that a protracted hearing in this case might have required the legislative process to grind to a halt could, of course, have been eliminated by following the example of Congress.

11. "I would go as far as any man in favor of the sharpest and most summary enforcement of order in Court and obedience to decrees, but when there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law deals with other illegal acts." Toledo Newspaper Co. v. United States, 247 U.S. 402, 425–426, 38 S.Ct. 560, 566, 62 L.Ed. 1186 (Holmes, J. dissenting).

12. The closest case I have found is Ex parte Terry, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405, in which the contemnor, after being forcibly removed from the courtroom, was forthwith committed for contempt. In that case, however, the Court expressly reserved decision on the question whether a circuit court would have had the power on "a subsequent day" to proceed to order the arrest and imprisonment of the contemnor "without first causing him to be brought into its presence, or without making reasonable efforts by rule or attachment to bring

But that is the nature of the procedure employed by the Wisconsin Assembly in this case. This departure from tradition should itself point to the danger of entrusting summary contempt powers to bodies not accustomed to their exercise. The contempt power has been described as "perhaps, nearest akin to despotic power of any power existing under our form of government." State ex rel. Attorney General v. Circuit Court, 97 Wis. 1, 8, 72 N.W. 193, 194 (1897), and its exercise has been narrowly limited.[13] Without reflecting adversely on the importance and dignity of the legislative function, it must be recognized that legislators are more responsive to the temporary moods of the body politic than are judges.[14] Therefore, history's recognition of a frequent need for summary punishment of judicial contempts does not establish a need for co-extensive legislative contempt powers.

It is argued that there was no risk of error or abuse in this case because petitioner's disorderly conduct occurred "in the immediate view of" the Wisconsin Assembly. It is contended that no pur-

pose could have been served by hearing from petitioner or his counsel because the Assembly already knew all the facts. This may or may not be true. It is entirely possible that conduct which certain legislators found particularly offensive was committed by other members of the "gathering of people" led by petitioner;[15] it is possible that some legislators were particularly offended by insulting speech (perhaps even speech on other occasions)[16] rather than conduct; and that certain conduct was viewed by some legislators but not by others. Even if each member of the Assembly who voted in favor of the resolution had perfect knowledge of the facts, a valid purpose would have been served by hearing from petitioner before voting on the resolution. It is presumed that argument may persuade judges even when they know the facts.[17] I would give legislators the benefit of the same presumption.[18]

It is suggested that even if summary legislative contempt powers have been unnecessary historically, the modern day "politics of confrontation" have created a new necessity that requires abandon-

him into court, and giving him an opportunity to be heard before being fined and imprisoned, * * *." 128 U.S. at 314, 9 S.Ct. at 83. In cases in which contempts during the course of a trial are not punished until the end of the proceeding, the contemnor is, of course, continuously present in court and normally given repeated opportunities to be heard in defense or mitigation before the imposition of sentence.

13. In Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 230, 5 L.Ed. 242, the Supreme Court stated that the legislative contempt power rests upon the principle of self-preservation and is limited to "the least possible power adequate to the end proposed." *Cf.*, Kielley v. Carson, 13 Eng.Rep. 225, 234–235 (P.C. 1842).

14. In the Seventeenth Century a judge who insulted the privileges of the House by questioning its contempt powers was himself subject to contempt proceedings, in which his political unpopularity apparently affected the members' deliberations. See colloquy between the Attorney General and Lord Ellenborough, C. J., in Burdett v. Abbott, 104 Eng.Rep. 501, 540–543 (1811).

15. The opinion of the Wisconsin Supreme Court states that the Legislature could not perform its public duties without "imprisonment of the intruders," 44 Wis. 2d at 291, 171 N.W.2d 192, yet the Assembly resolution related only to petitioner.

16. Legislative attempts to punish disrespectful speech as contempt have occurred in the past but have not met with judicial approval. See Marshall v. Gordon, 243 U.S. 521, 545–546, 37 S.Ct. 448, 61 L.Ed. 881.

17. In judicial proceedings in which there is no genuine dispute as to a material fact, and when only property rights are affected, the court may not enter a summary judgment without proper notice and argument. See Fed.R.Civ.P. 56.

18. When the Assembly voted on the resolution, presumably the need for emergency action had passed. At that time, since the Wisconsin courts disapprove of punishment by the Legislature for past misconduct, an argument questioning the propriety of a legislative sentence of six months would not have been frivolous. 44 Wis.2d at 296, 171 N.W.2d 192.

ment of traditional procedures. I question the validity of the argument, even if limited in application to plenary sessions of state legislative bodies, for prompt police action is probably an adequate means of terminating disorder and enabling the legislative body to resume its work. If the argument of necessity were valid, it would prove too much. Confrontations occur in legislative committee hearings, union meetings, stockholders meetings, public parks, college campuses, and the streets. Violent, disorderly conduct in all these settings should be firmly and promptly punished. I am not convinced that the effective administration of justice will be enhanced by using *ex parte* procedures to deal with any of these situations, or by providing an unusual protective procedure available only to legislative assemblies.

If punishment is to serve as an effective deterrent to repeated or widespread disorder, it is important that the community at large have confidence in the fairness of the proceedings which lead to conviction and sentencing.

"At the foundation of our civil liberty lies the principle which denies to government officials an exceptional position before the law and which subjects them to the same rules of conduct that are commands to the citizen. And in the development of our liberty insistence upon procedural regularity has been a large factor. Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play." Burdeau v. McDowell, 256 U.S. 465, 477, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921) (Brandeis J. dissenting).

In my opinion the preservation of order in our communities will be best ensured by adherence to established and respected procedures. Resort to procedural expediency may facilitate an occa-

sional conviction, but it may also make martyrs of common criminals.

I respectfully dissent.

KILEY, Circuit Judge (dissenting).

I join in Judge STEVENS' dissent for the reasons he gives.

I dissent for the further reason that the Assembly Resolution does not state facts sufficient to support its conclusion that Groppi was guilty of disorderly conduct punishable as contempt. The effect upon Groppi of this fatal deficiency was denial of fundamental fairness because he is not informed of what he did in the "immediate view" of the Assembly which amounted to disorderly conduct.

Groppi's habeas petition does not expressly cast the deficiency in the Resolution as a denial of due process as we have done. His petition alleges denial of his "right to be informed of the nature and cause of the accusation against him." [1] In this court Groppi argues persuasively the anomaly of a summary or direct contempt order reciting only a legal conclusion without a statement of the underlying facts supporting the conclusion. And he argues that "it is not clear" how a court can adequately review a contempt order unless the facts are stated. [2]

It is a fundamental rule that a judicial summary contempt order must carry, in itself, a statement of the acts or words constituting the contempt. This rule is implicit in Ex parte Terry, 128 U.S. 289, 305, 9 S.Ct. 77, 32 L.Ed. 405 (1888); and is stated in Tauber v. Gordon, 350 F.2d 843 (3rd Cir. 1965); Parmelee Transportation Co. v. Keeshin, 294 F.2d 310 (7th Cir. 1961); and Hallinan v. United States, 182 F.2d 880 (9th Cir. 1950). In Great Lakes Screw Corp. v. NLRB, 409 F.2d 375 (7th Cir. 1969), where an NLRB hearing examiner excluded defendant's counsel from the hear-

---

1. Groppi made similar allegations in his petition for habeas corpus in the state proceedings.

2. The Wisconsin Supreme Court took judicial notice of facts not in the record. These "facts" are contained in footnote 2 in the majority opinion here.

ing for "contumacious conduct," this court held that the exclusion violated defendant's due process rights, saying "[n]o compelling reason exists for not extending the requirement of adequate disclosure of the basis for contemptuous conduct findings to the quasi-judiciary. as well as the judiciary." Id. at 379. Respondent-appellant's brief concedes that legislative exercise of its summary contempt power parallels judicial exercise of that power, and I see no reason why the legislature should not be similarly required to state facts constituting the contempt.

Here the contempt resolution states that "Groppi led a gathering of people * * * which by its presence on the floor of the Assembly during a meeting * * * prevented the Assembly from conducting public business and performing its constitutional duty" and that the "above-cited action" constituted "disorderly conduct in the immediate view" of the Assembly, an offense under Sec. 13.-26(1) (b) Wis.Stat. and Art. IV, Sec. 8 of the Wisconsin Constitution. According to the Resolution, anyone—however innocently—who leads a "gathering of people" on the Assembly floor is ipso facto guilty of contempt. There is no statement, for example, of what activities Groppi or the "gathering" engaged in, how they obtained admission to the floor of the Assembly, or how the Assembly was prevented from performing its constitutional functions. All of this is left to the speculation of the reviewing court.

A complaint for disorderly conduct drawn in words similar to the Resolution before us would not support a conviction. People v. Mulvey, 206 Misc. 771, 135 N.Y.S.2d 17 (1954); People v. Lee, 334 Ill.App. 158, 78 N.E.2d 822 (1948); State v. Hettrick, 126 N.C. 977, 35 S.E. 125 (1900). An indictment, where the subject law is general, must descend to particulars. Russell v. United States, 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); United States v. Cruikshank, 92 U.S. 542, 548, 23 L.Ed. 588 (1875). See also United States v. Carll,

105 U.S. 611, 612, 26 L.Ed. 1135 (1882). *A fortiori*, where a person is punished by imprisonment without being informed of what he did that was unlawful, he is denied fundamental fairness. No meaningful review would be available to him. See Great Lakes Screw Corp. v. NLRB, 409 F.2d 375 (7th Cir. 1969).

Because Groppi has not been informed in the Assembly Resolution what acts or words of his constituted disorderly conduct so as to be contemptuous, I would affirm.